Cameron Husty (CA Bar 97062)
camhusty@gmail.com
Attorney at Law
1710 Hermitage Drive
Round Rock, Texas 78681
Phone: 876 435-7934

Ronnie G. Penton (LA Bar 10462)
fedcourtmail@thepentonlawfirm.com
The Penton Law Firm
503 Georgia Avenue
Bogalusa, Louisiana 70427
Phone:   985-732-5651
Fax:      985-735-5579
Appearing Herein *pro hac vice, pending*

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **LONI LAWS- ROGERS AND** | * | **Civil Action No. _____** |
| **TOM ROGERS** | * | |
| **Plaintiffs** | * | |
| **versus** | * | **COMPLAINT FOR DAMAGES** |
| | * | |
| **INTUITIVE SURGICAL, INC.** | * | **DEMAND FOR JURY TRIAL** |
| **a Delaware corporation** | * | |
| **headquartered in California** | * | |
| **Defendant** | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### *Parties*

1.      Plaintiff, Loni Laws-Rogers, is an individual and resident citizen of

Spokane, Washington.  The aforementioned Plaintiff suffered serious injury and damages

that were caused by or contributed to by the Defendant's defective and dangerous da

Vinci Surgical Systems, accessories, components and instrumentation.

2.      Plaintiff, Tom Rogers, is an individual and resident citizen of Spokane, Washington and is the lawful, marital spouse of co-plaintiff, Loni Laws-Rogers.  That as a direct result of the tortious injury to his spouse by Defendant's defective and dangerous da Vinci Surgical Systems, its accessories, components and instrumentation, plaintiff has sustained an impairment to his marriage he once enjoyed including the conjugal society, companionship, sexual relations, comfort, affection, emotional support, love, felicity, assistance, protection and moral support.  That the losses he has sustained were immediate and consequential, not remote nor unforeseeable.

3.      Intuitive Surgical, Inc. (hereinafter "Intuitive" or "ISI") is a Delaware corporation with its headquarters in Sunnyvale, California.  ISI makes and sells the da Vinci surgical robot and numerous electrosurgical instruments used with that robot.

## *Jurisdiction*

4.      There is complete diversity between plaintiff and defendant as Loni and Tom Rogers do not live in the same state as the defendant, and this Court has jurisdiction under 28 U.S.C. § 1332 as the amount in controversy, without interest or costs, exceeds the sum or value of $75,000.00.  This Court has personal and subject matter jurisdiction.  Intuitive Surgical is headquartered in Sunnyvale, California.  The parties have also entered a contractual tolling agreement to the effect that this suit may be brought in the Northern District of California.  Venue is thus proper in this District.

## Intradistrict Assignment

5.      A substantial part of the events or omissions that give rise to this claim occurred in Santa Clara County, California, therefore, this matter is properly assigned to the San Jose Division of this Court.

## Nature of the Action

6.      Plaintiffs bring this action against Intuitive Surgical, Inc. for its design, manufacture, marketing, distribution, and/or sale of the da Vinci Surgical System and its accessories, components and instrumentation including, but not limited to, the Monopolar Curved Scissors, which took place throughout the United States, including the City of Spokane, Washington .  Plaintiffs herein have been injured as a result of defects in the da Vinci Surgical System, its accessories, components and its instrumentation including, but not limited to, the Monopolar Curved Scissors.

## The Plaintiff's Surgery

7.      Plaintiff had a da Vinci Robotic-Assisted Laparoscopic Hysterectomy with Left Salpingo-Oophorectomy at Deasoness Medical Center in Spokane, Washington on May 12, 2011.  Plaintiff was injured in this surgery by thermal/electrical energy produced by the robot.  Plaintiff suffered a bladder injury that required additional corrective medical treatment.  Plaintiff continues to experience medical problems as a result of this injury.

8.      The surgeon who performed plaintiff's surgery was not at fault for her electrosurgical injuries.

9.     Because of ISI's inadequate disclosures about its robot's operation, surgical hazards and defects to the hospital and/or the plaintiff's surgical team, plaintiff was not aware, prior to consenting to the da Vinci Robotic-Assisted Laparoscopic Hysterectomy with Left Salpingo-Oophorectomy, that the instruments to be used for the surgery had potential insulation defects and/or surgical operational hazards that made them more prone to causing unintended burns than open surgery, traditional laparoscopic instruments, and/or laparoscopic instruments using an active electrode monitoring system.

## *Factual Background*

10.     The da Vinci robot ("the robot") is a multi-armed, remote controlled, surgical device made by ISI.

11.     ISI also manufactured "EndoWrist" instruments for use in surgery by the robot.  These instruments consist of forceps, electro- cautery, scissors, scalpels, and other surgical tools.  Certain of these instruments use electrical energy to cut and cauterize living body tissue.

12.     The Company also manufactures EndoWrist instruments consisting of forceps, scissors, electrocautery, scalpels, and other surgical tools, which incorporate wrist joints for natural dexterity for various surgical procedures.  In addition, the Company offers da Vinci single-site instruments and accessories that reportedly allow da Vinci Si surgical systems to work through a single incision; and EndoWrist One vessel sealer, a wristed single-use instrument intended for bipolar coagulation and mechanical

transection of vessels up to 7 mm in anastomoses, in general, gynecologic, and urologic surgery, and sells various accessory and tissue bundles that fit in the jaws of the instrument.

13.     Further, the Company provides the EndoWrist Stapler 45 instrument, a wristed stapling instrument intended for resection, transaction, and/or creation of, such as sterile drapes, 3-D stereo endoscopes, camera heads, light guides, and other items that are used in conjunction with the da Vinci surgical system.  Intuitive markets its products directly and through distributors in the United States and internationally.

14.     ISI has been enormously successful.  ISI began operations in 1995.  As of September 30, 2014, it had installed 3,174 robots in hospitals worldwide.  Its average selling price for a da Vinci system was $1.47 million for the nine months that ended September 30, 2014.  Its produce revenue was $1.208 million for that nine months, and instruments and accessories revenue constitute $789.5 million for that period, or more than 65 percent of its total produce revenue (which does not include another $319 million in "Services" revenue).

15.     Most of the instruments ISI sells are either disposable or "re-sposable," meaning they may be used for a certain number of procedures only before they must be replaced.

16.     The injuries suffered by plaintiff are not unique.  According to its SEC filings in 2014, ISI had been named as a defendant in approximately 93 individual product liability lawsuits filed in various state and federal courts by plaintiffs who allege that they or a family member underwent surgical procedures that utilized the da Vinci

Surgical System and sustained a variety of personal injuries and, in some cases, death as a result of such surgery.

17.     ISI has also received thousands of injury and defect reports related to surgeries using *da Vinci*.  The most dangerous injuries arose from burns to internal organs caused by the discharge of electricity (usually in the form of sparks), caused by the robot's instruments inside the patient.  Despite the severity and multitude of reports, ISI has systematically underreported these injuries and their seriousness to the United States Food and Drug Administration (the "FDA").

18.     As the reports continued to increase, the FDA finally initiated an investigation in 2013, which culminated in the issuance of a warning letter on July 16, 2013.  The FDA Warning Letter concluded that ISI had concealed information from the FDA, secretly recalled defective parts, and ignored known injuries to patients in its design process of critical *da Vinci* instruments.

19.     After inspecting ISI's headquarters in April and May 2013, the FDA reported that ISI had received hundreds of complaints and reports between July 2009 and December 2011.  Many of these reports concerned a little rubber sleeve placed on the wrist of certain *da Vinci* metal instruments, designed as an insulating device to prevent electricity from escaping.  The plastic sleeves were referred to as tip cover accessories. The critical defect consisted of cracks or slits that prevented the tip cover accessories from properly insulating the metal instruments and allowed electricity or sparks to escape, an effect known as arcing.  Because the arcing usually occurred outside of the

surgeon's camera field of vision, blood vessels and organs were burned without the medical/surgical team's knowledge.

20.    The tip cover defect is not the only defect in ISI's instruments.  ISI also sold instruments with defective shafts below the tip cover.  This defect consisted of material that allowed "microcracking" that was imperceptible to the naked eye of surgeons and medical staff charged with inspecting instruments prior to use in surgery. These microcracks also allowed electricity to escape, in the form of sparks, in ways that caused unintended burns to the organs of patients undergoing da Vinci surgeries.

21.    In its April 2006 "da Vinci Procedure Guide" (ISI Product Number 8714023, Rev. A. 4/06), ISI recommends the use of its 8 mm Monopolar Curved Scissors, also known as "Hot Shears," in the use of every da Vinci surgery.

22.    ISI also chose not to implement "active electrode monitoring" into its da Vinci system when it sold that system and its accompanying instruments to the hospital. As a result, the system and instruments that were used on plaintiff did not automatically shut off before unintended electricity escaped from the instruments used on plaintiff, burning her bladder.

23.    A design with active electrode monitoring would have been a safer alternative design in that it, in reasonable probability, would have significantly reduced the risk of plaintiff's injury without substantially impairing the product's utility.  A design with active electrode monitoring was economically and technologically feasible at the time the da Vinci system in question left ISI's control by the application of existing or reasonably achievable scientific knowledge.

24.     Intuitive was on notice about the defective Tip Covers and quietly sought to take "corrective action" as early as October 2011.  According to the FDA Warning Letter, "[t]his correction was in response to complaints and medical device reports (MDRs) for arcing through damaged tip covers that caused patient injuries."  But Intuitive did not report this corrective action to the FDA, as required, which the FDA subsequently classified in the July 2013 FDA Warning Letter as a "Class II Recall."  In addition to the Tip Cover correction, Intuitive initiated two other corrective actions in October 2011, both of which were concealed from the FDA.

25.     Aware of the increase in injuries caused by the defective Tip Covers, and after having concealed the seriousness of the issue from the FDA by failing to report the October 2011 recall, Intuitive also engaged in a concerted effort to minimize the importance of the reports that did reach the FDA.  FDA regulations require that hospitals report to the manufacturer (i.e. Intuitive) serious injuries arising from the use of da Vinci. In turn, these regulations also require Intuitive to submit these medical device reports, or MDRs, to the FDA.  MDRs filed with the FDA are compiled in the FDA's Manufacturer and User Facility Device Experience ("MAUDE") database.

26.     To hide the da Vinci defects, however, Intuitive consistently underreported MDRs, misclassified them under the innocuous category of "other," even though scores qualified as "serious injury," and added self-serving disclaimers in the file, MDRs concerning the purported lack of evidence linking the injury or harm to a da Vinci defect.

27.     In September 2012,  the  FDA  met  with  Intuitive to address the Company's underreporting and misclassification of the MDRs.  As a result, Intuitive was

required to change its reporting policies by (i) reporting MDRs not previously submitted to the FDA, and (ii) upcoding many MDRs previously labeled "other" to "serious injury." It was only after these significant changes to Intuitive's MDR reporting practices, and the material rise in serious MDR reports, that in January 2013, the FDA began a safety probe of the Company. The FDA probe suggests that, after the FDA realized in September 2012 that Intuitive had been improperly labeling the MDRs, the FDA did not fully trust the Company's role as a middleman between the hospital reports and those that Intuitive submitted to the agency.

28. The FDA thus sent out a survey directly to hospitals in January 2013 seeking, among other things, information concerning (i) problems or challenges with da Vinci; (ii) complications during surgeries; (iii) problem-causing da Vinci devices; and (iv) surgeons' familiarity with da Vinci recalls and corrective changes. In addition to this written survey, the safety probe also included one-hour interviews with surgeons.

29. Intuitive's ability to conceal product defects and problems, however, was soon to end. After the FDA launched the safety probe in early 2013, it followed with a lengthy inspection of Intuitive's headquarters between April 1 and May 30, 2013. At the end of the inspection, the FDA issued a Form FDA-483 ("Form 483") to Intuitive setting forth the objectionable conditions.

30. The objectionable conditions set forth by the FDA were as follows:

(a) The discovery by the FDA that Intuitive had carried out the secret recall of the Tip Covers in October 2011, as discussed above;

(b)    In addition, and equally dangerous to patients' health, Intuitive was on notice since 2010 that surgeons needed to clean da Vinci instruments while inside the patient's bodies, and that to do so, they scrubbed one instrument against another. This had consistently led to tears or holes in the Tip Covers that led to arcing that, in turn, caused injuries to patients.

(c)    FDA regulations thus required Intuitive to address this "user need" through a rigorous and heavily regulated design control process. Intuitive entirely ignored this user need, did not document it, and never even sought to address this health risk, in flagrant violation of FDA regulations.

31.    On July 16, 2013, the FDA warning letter, in large part, formally determined that its observations listed in the Form 483 were violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), and thus represented a significant escalation of the FDA's regulatory action. According to the FDA Warning Letter, (i) the Tip Covers constituted "misbranded devices"; (ii) Intuitive knew that the Tip Covers in October 2011 posed a risk to health and, yet, Intuitive proceeded to conduct a secret recall while failing to report this "correction," thereby violating FDA reporting requirements; (iii) Intuitive also knew that the intraoperative cleaning of da Vinci instruments caused the Tip Covers to fail, leading to arcing, and yet ignored the problem, again violating FDA regulations, including Current Good Manufacturing Practices; and (iv) after having been notified of these violations, pursuant to the Form 483, Intuitive had submitted incomplete and

inadequate responses to the FDA on June 7, 2013.

32.     Tellingly, the FDA Warning Letter added, "[t]he FDA has previously informed you of your firm's correction and removal violations in an untitled letter dated February 19, 2008, and FDA 483 Inspectional Observation issued on December 20, 2002."   In saying this, the FDA was confirming that failing to report corrections and removals (i.e., the secret recall) was an ongoing, unsolved issue with Intuitive.

33.     The da Vinci Surgical System consists of several key components, including (i) an ergonomically designed console equipped with a high-definition 3-dimensional vision system where the surgeon sits while operating; (ii) a patient-side cart where the patient lays during surgery; (iii) three or four interactive robotic arms; (iv) proprietary EndoWrist® instruments that attach to the robotic  arms; and (v) a hardware console,  which  houses  the  computer  operating  system  and software that controls the robotic arms.  Together, these components allow surgeons to operate by manipulating a suite of tiny computer-assisted remote control tools through a small tube inside a patient.

34.     The EndoWrist Instruments include a number of endoscopic surgical parts used with da  Vinci  for  a  wide  range  of  surgical  tasks,  such as tissue manipulation, suturing, cutting, coagulation, and clamping.  Most instruments have an articulating design at the tips that enter the patient's body, known as a "wrist," and provide various degrees of motion that mimic the human hand and wrist-movements.  Quick-release levers facilitate instrument changes during surgical procedures.  The instruments also have an electronic tag that identifies each specific instrument and limits the number of uses so that the tag "expires" the instrument after a pre-determined number of uses.

35.     The most commonly used Endowrist instrument is the Hot Shears Monopolar Curved Scissors ("Monopolar Scissors").  According to a study entitled "Robotic Instrument Insulation Failure: Initial Report of a Potential Source of Patient Injury," co-authored by Adam C. Mues, Geoffrey N. Box, and Ronney Abaza, and published in 2011 in the Journal of Urology, 24 surgeons performed 454 robotic procedures between July 2008 and January 2009, and all of the procedures involved the Monopolar Scissors.

36.     The use of the Monopolar Scissors is so prevalent because it allows doctors to both cut and cauterize tissue during surgical procedures.  Cauterization occurs through the application of monopolar electricity. To prevent the electricity from spreading to unwanted areas, the Monopolar Scissors requires the use of the Tip Cover, which is also sold by Intuitive.  The Tip Cover is a sleeve and consists of a silicon or flexible rubber like material connected to a harder plastic-like tube called an altum.  It is placed over the end of the Monopolar Scissors to insulate the instrument's metal parts and allow only the exposed electrode (the scissor blades) to emit electrical current to the intended area designated by the surgeon.

37.     While the intended use of the current is cauterization, when inadvertently applied to adjacent tissue, the current causes harmful burns and other serious injuries. "The Tip Cover plays an important role in the robotic instrument" because it "serves as an insulation for the metallic segment of the EndoWrist and prevents broad dissipation of monopolar electric current," according to an article published in March 2011 by Yonsei University College of Medicine, entitled "Iliac Vein Injury Due to a Damaged Hot Shears

Tip Cover During Robot Assisted Radical Prostatectomy." If the Tip Cover functions properly, "[i]t allows safe dissection in proximity to delicate structures such as blood vessels, nerves and bowel."

38.     If the Tip Cover fails, however, electricity can escape the Monopolar Scissors and burn or harm patients. This is commonly referred to as "arcing" because a visual arc of electricity is formed from the defect in the insulated portion of the Tip Cover to another instrument or tissue. The tissue is thus burnt and injured. Even more severe injuries occur when the arcing is not in the field of vision of the surgeon and, therefore, remains undetected. Perforation of internal organs and blood vessels causes internal bleeding and severe injuries that are discovered days after the surgery, and only after the patient's condition has deteriorated rapidly for unknown reasons.

39.     At least as early as October 2011, Intuitive was on notice that the Tip Cover was defective, did not insulate properly, and allowed electricity to escape. One of the problems was that it was very difficult to install correctly, in part because it required a fairly large amount of force to fit the rubber-sleeve Tip Cover over the instrument. Because the Tip Covers were fragile when installed incorrectly or after the use of force, they were easily damaged or torn.

40.     On October 10, 2011, Intuitive was caused to send out a letter to hospitals that used da Vinci systems which corrected the instructions for proper use for Tip Covers and sought to prevent tears and ensure that Tip Covers functioned properly. This letter was sent in  response to complaints and MDRs reporting arcing through damaged Tip Covers that had caused patient injury, but did not distribute the letter publicly.

41.     The FDA Warning Letter, issued in July 2013, also found that, in violation of FDA regulations, Intuitive did not report this recall to the San Francisco District Recall Coordinator ("SFDRC"), the designated FDA office to receive such reports.  Intuitive concealed this corrective action from the FDA as part of a broader concerted effort to bury and minimize any negative reports about da Vinci's surgical system.

42.     Intuitive also concealed from the  FDA other serious corrective actions.  On October 13, 2011, Intuitive sent out another letter notifying da Vinci hospitals that da Vinci was not cleared for thyroidectomy procedures, i.e., the surgical removal of all or part of the thyroid gland.  Intuitive had previously marketed the da Vinci surgical system for these procedures and profited from the revenues generated.  Intuitive also failed to report this letter to the SFDRC.  The FDA, again, later classified Intuitive's corrective action taken on October 13, 2011 as a "Class II Recall."

43.     On October 17, 2011, Intuitive sent yet a third corrective letter to hospitals utilizing the da Vinci surgical system with information for inspecting instrument cannulas, i.e., a hollow rigid tube inserted into the body that allows the instruments on the robotic arms to access patients' anatomy through the small incisions.  Damaged Tip Covers due to defective cannulas was identified in the Form 483 as "one of the root causes" for arcing that resulted in patient injuries.  This action was also not reported to the SFDRC.  Again, the FDA later classified Intuitive's corrective action, taken on October 13, 2011, as a "Class II Recall."

44.     Pursuant to § 519(g) of the FDCA, 21 U.S.C. § 360i(g), and 21 C.F.R. § 806 of the Reports of Corrections and Removals regulation, Intuitive was required to

provide promptly to the FDA a written report "of any correction or removal of a device initiated by such manufacturer or importer if the correction or removal was initiated [to] . . . reduce a risk to health posed by the device."  21 C.F.R. § 806.10(a).  The regulation defines a "[c]orrection" as "the repair, modification, adjustment, relabeling, destruction, or inspection (including patient monitoring) of a device without its physical removal from its point of use to some other location." 21 C.F.R. § 806.2(d).

45.    A "[r]isk to health" is defined as "(1) [a] reasonable probability that use of, or exposure to, the product will cause serious adverse health consequences or death; or (2) that use of, or exposure to, the product may cause temporary or medically reversible adverse  health consequences, or an outcome where the probability of serious adverse health consequences is remote." 21 C.F.R. § 806.2(j).  "Removal" means "the physical removal of a device from its point of  use  to  some  other  location  for  repair, modification,  adjustment, relabeling, destruction, or inspection." 21 C.F.R. § 806.2(i).

46.    Medical device reports also showed that Intuitive was on notice of the defects in the tip covers for years.  The main mechanism through which the FDA is apprised of health risks from medical devices, including da Vinci, are MDRs. The purpose of MDRs is "to protect the public health by helping to ensure that devices are not adulterated or misbranded and are safe and effective for their intended use."  21 C.F.R. § 803.1.

47.    MDRs are, therefore, critical components of the FDA's ability to monitor a device's performance and determine if further FDA actions are necessary, including inspections of facilities and post-market studies.  MDRs filed with the FDA are compiled

in the FDA's MAUDE database.  An analysis of the MAUDE database, along with the results, show that there had been a substantial and material increase in Tip Cover-related MDRs in 2011 and 2012, compared to prior years. (These MDRs reference Tip Cover model number 400180).

48.     More recently, issuance of MDRs related to Monopolar Scissors and Tip Covers(model numbers 400180, 400179, 420179) have continued their steep upward trajectory.  In 2013, there had been a 54% increase in reported MDRs related to Monopolar Scissors and Tip Covers, compared to 2012, from 128 in 2012 to 197 in 2013. Intuitive caused the Company to systematically conceal and underreport medical device reports to the FDA.

49.     Strict regulations promulgated by the FDA govern MDR reporting procedures, which rely primarily on the manufacturer's reporting obligations since approximately 94% of the MDRs received by the FDA are reported by the manufacturer. Pursuant to these regulations, when an adverse event related to a serious injury occurs, user facilities, e.g. hospitals, are required to report these injuries to the manufacturer: "whenever a device user facility [e.g. hospitals] receives or otherwise becomes aware of … information that reasonably suggests that a device has or may have caused or contributed to death or serious injury.

50.     Manufacturers must report to the FDA "no later than 30 calendar days after the day that the manufacturers receive or otherwise become aware of information, from any source, that reasonably suggests that a device that the manufacturers market: (1) [m]ay have caused or contributed to a death or serious injury; or (2) [h]as malfunctioned

and this device or a similar device that the manufacturers market would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur." 21 C.F.R. § 803.50(a).

51.    The obligations of Intuitive were not limited to merely reporting adverse events, but also included the obligation to further investigate and understand the underlying causes.   Manufacturers "are also responsible for conducting an investigation of each event and evaluating the cause of the event." 21 C.F.R. § 803.50(b).

52.    In addition to flagrantly failing to report deaths and other serious injuries to the FDA, Intuitive also misclassified the injuries that it actually reported to minimize their import.  On March 13, 2013, Intuitive issued a press release (filed on March 14 with the SEC on Form 8-K) (the "March 13 Press Release"), admitting that, until September 2012, the Company had been improperly classifying serious injuries as "other."  After that date, Intuitive elevated the same events to the category of "serious injury." Intuitive had thus admitted that, until September 2012, they had been underreporting "serious injuries" arising from da Vinci surgeries.

53.    The effect of the reclassification was to almost double the number of serious injuries in 2012 to 131.  Intuitive provided no sufficient explanation for their failure to properly report serious injuries and how serious injuries could possibly have been classified with the innocuous label of "other." The March 13 Press Release further admitted that  Intuitive had not been reporting MDRs properly to the FDA.  In a cryptic disclosure, Intuitive stated that, in September 2012, the Company had "revised its MDR practices," which had then resulted in "increased reports."  Intuitive again did not explain

the nature of the revision.  Simply put, Intuitive withheld MDRs from the FDA in an effort to minimize the number and import of any negative adverse events.

54.     Intuitive's April 19, 2013, first quarter 2013 Form 10-Q for the period ending March 31, 2013, issued statements regarding the da Vinci surgical system that were materially false and misleading as it denied the validity of the safety issues and failed to disclose that, (i) da Vinci posed a material health risk to patients; (ii) da Vinci already had known defects; (iii) Intuitive had violated FDA regulations by failing to report to the FDA corrective actions taken by Intuitive to reduce health risks posed by da Vinci; (iv) Intuitive had already undertaken three secret field actions in October 2011 to reduce risks to health posed by da Vinci that constituted Class II Recalls, as determined by the FDA in its Warning Letter; (v) the issuance of a substantial number of MDRs and complaints reporting material health risks to patients as a result of da Vinci in the three months between January 1, 2013 and March 31, 2013; (vi) Intuitive had failed to report, or timely report, adverse events through the MDR mechanism, as required by 21 C.F.R. § 803.50; (vii) Intuitive had violated Current Good Manufacturing Practice (CGMP) requirements, as set forth in the Quality System regulation (21 C.F.R. § 820); (viii) at least 16 personal injury and/or product liability lawsuits had been filed against Intuitive between March 18, 2010 and April 18, 2013, nine of which alleged injuries associated with Microcracks/insufficient insulation - Monopolar current; (ix) the FDA had commenced a safety probe in January 2013, in response to the increase in number of da Vinci-related MDR reports; and (x) the FDA had commenced an inspection of

Intuitive's facilities on April 1, 2013, during which numerous safety related violations were found.

55.     The da Vinci systems, including accessories, components and instruments, were never subject to pre-market licensing or approval.

56.     If ISI had safety designed its product so that stray electrical energy would not burn the insides of patients without the knowledge or control of the operating surgeons, the injuries to plaintiff would not have occurred.  If ISI had adequately warned the hospital or the surgeon who performed the plaintiff's surgery about the problems with its instruments, the injuries to plaintiff would never have occurred.  Instead, the hospital and the surgeons trusted ISI and plaintiff was unnecessarily and permanently injured as a result.

57.     ISI's deceptive and aggressive marketing about the safety and efficacy of da Vinci surgery was one of the reasons the plaintiff's surgery went forward.  This deceptive and aggressive marketing was directed at the hospital and to the surgeon who performed the plaintiff's surgery.  This business tactic of ISI's, which has been enormously successful, threatens the public interest and has injured plaintiff physically, mentally, and financially as she continues to deal with the long-term medical consequences of the injury to the bladder injury and associated adjacent tissue.

### Intunitive's Aggressive Sales Tactics
### and Marketing Strategies Disregarding Patient Safety

58.     While Intuitive fiercely sought to conceal and minimize the disclosures regarding the extent and severity of patients' injuries caused by da Vinci, they also caused the Company to engage in extremely aggressive marketing practices to sell its only product.

59.     These marketing practices reflect that Intuitive had little regard for the safety of patients.   Intuitive and the Company's sales personnel simply wanted to make their numbers.  In order to do this, Intuitive's sales force employed all kinds of stratagems to increase the number of procedures using da Vinci and ultimately the number of sales of da Vinci systems.  For example, according to an article published on March 25, 2013, by The New York Times ("NYT"), Intuitive's sales force consistently sought to circumvent or minimize surgeon training requirements designed to ensure patients' safety in order to increase the number of procedures.

60.     In an internal Intuitive e-mail dated May 31, 2011, a Western regional sales manager for Intuitive noted that area surgeons had used robotic equipment only five times, although the company's goal was to see 36 robotic operations performed by the end of June.  He urged sales staff to persuade surgeons to switch upcoming cases to robotic ones. "Don't let proctoring or credentialing" - shorthand for supervised surgery and hospital certification - "get in our way," the e-mail said.

61.     The effort to increase procedures by disregarding surgeon training also consisted of applying direct pressure on hospitals. In December 2009, a sales

representative urged a hospital in Billings, Montana to ease up on its credentialing requirement saying, in an email, that requiring surgeons to do five supervised operations using the robot before going solo was "on the high side" and could have "unintended consequences."  Hospital officials replied, saying, "We will review and most likely will decrease the 5 down to 3."

62.    In another email, a clinical sales director instructed the sales team to "scrub" doctors' schedules and get procedures moved up by a few days in order to make Intuitive's quarterly goal."

63.    In a third email, a clinical sales director told the sales team to "[b]e prepared to challenge each trained surgeon every time you see a laparoscopic or open case.  Be unsatisfied with the thought of ending a day without a converted case," meaning, pressuring a surgeon to use da Vinci instead of operating laparoscopically or with an open incision.

64.    In fact, the sales force was so entrenched in the hospital decision-making process and daily routines, that Intuitive sales representatives were even present inside the operating rooms during surgery, offering advice to newly trained surgeons if they were having technical difficulties with the robot.

65.    Another aggressive tactic employed by Intuitive in marketing da Vinci was the use of seemingly independent medical professors who promoted the device, even in the face of growing safety concerns, without disclosing the financial incentives received from the Company.

66.     According to an article published on September 20, 2013, in the Orange County Register, "UCI Doctors Downplayed Risks Of Surgical Robot," at least two seemingly independent professors touted da Vinci while reaping undisclosed financial rewards.  Specifically, Professors Ralph Clayman and Thomas Ahlering provided Intuitive with so called independent opinions that da Vinci was safe.  But undisclosed was the fact that Intuitive had paid Professor Ahlering, or his foundation, at least $107,000 since 2002, and that Intuitive was a top financial supporter of an academic society co-founded by Professor Clayman, which paid him $30,000 per year.

67.     The article further reported that Intuitive had also given to the University of California Irvine, the school where Clayman was dean, nearly $1.5 million in grants and reimbursements.   Intuitive was thus able to promote da Vinci as safer than it was, through the use of professors who were viewed as disinterested, but were decidedly not. These  sales  and  marketing  techniques  were  all  the  more  successful  because Intuitive omitted to tell these doctors and patients (or the FDA) of the growing health risks associated with da Vinci procedures and defects in the da Vinci instruments and accessories.

68.     In January 2013, The FDA began to uncover significant da Vinci-related defects and FDA violations.  On the heels of the September 2012 reclassification of serious injuries, the FDA noted an increase in the number of reports of adverse events. Given that Intuitive had caused the Company to previously "down-code" the adverse reports without providing any justification, the FDA this time leapfrogged Intuitive's role in the reporting chain of custody and went directly to the source, the physicians.  In a

letter survey to physicians, the FDA asked them to provide information about adverse events related to da Vinci directly to the FDA, not Intuitive.   The letter further indicated that the survey would not be limited to a question and answer form, but that agency officials would speak with surgeons for up to an hour. "What the FDA [was] trying to determine with the survey [was] whether adverse event reports sent to the agency [were] "a true reflection of problems" with the robots, or the result of other issues.

69.     ISI's website, as of December 29, 2010, stated that, "the *da Vinci* Surgical System combines robotics and surgical technology as never before, enabling your surgeon to provide the most effective and least invasive treatment option available for a wide range of complex conditions."  In fact, there was no reasonable evidence that *da Vinci* surgery was the most effective treatment option available, and that claim was untrue.[1]

70.     ISI's own website, as of December 29, 2010, stated, "Clinical studies suggest that the extended capabilities provided by the *da Vinci* System may help surgeons provide better clinical outcomes than conventional open and minimally invasive surgery allow."  In fact, there was no reasonable evidence for this claim, and that claim was untrue.[2]

71.     ISI's own website, as of December 29, 2010, stated, "surgeons using the *da Vinci* System can operate with greater precision and control, minimizing the pain and risk

---

[1]     http://web.archive.org/web/20101229173225/http://www.davincisurgery.com/davinci-procedures/

[2]     http://web.archive.org/web/20101229173255/http://www.davincisurgery.com/davinci-procedures/

associated with large incisions while increasing the likelihood of a fast recovery and excellent clinical outcomes."  In fact, there was no reasonable evidence for the claim that *da Vinci* surgery increases the likelihood of excellent clinical outcomes, and that claim was untrue.[3]

72.     ISI's own website, as of December 29, 2010, stated, "The da Vinci System required that every surgical maneuver be performed with direct input from your surgeon."[4]  In reality, the da Vinci system was designed in such a way that cauterizing energy was released in the body without direct input from the surgeon.  ISI did not change its inaccurate statement, despite learning of the problems with unintended cauterization of patient organs.  In fact, the ISI website captured as recently as July 10, 2014, stated, "The da Vinci System cannot move or operate on its own; your surgeon is 100% in control."

73.     ISI's marketing materials, and the marketing materials that ISI provided to hospitals, included citations only up to 2005, even though many published, peer-reviewed studies after 2005 showed serious questions about the safety and efficacy of da Vinci surgery.  Those articles are discussed in more detail below.

74.     ISI's marketing materials do not disclose that da Vinci Robotic-Assisted Laparoscopic Hysterectomy with Left Salpingo-Oophorectomy is more expensive than other, safer forms of this procedure.

---

[3]     http://web.archive.org/web20101229172326/http://www.davincisurgery.com/gynecology/

[4]     http://web.archive.org/web/20101229182725/http://www.davincisurgery.com/davinci-surgery/davinci-surgical-system/

75.     ISI and Intuitive Surgical Operations, Inc. paid over $41 Million to doctors and hospitals between August 2013 and December 2014, including payments to 12,911 different doctors.

## *ISI's Awareness of Literature Contradicting its Marketing Claims*

76.     From the inception of the company through the plaintiff's surgery, ISI closely monitored all published academic literature concerning the robot.  It maintained a searchable database of this literature for its own internal use.

77.     On August 19, 2010, the New England Journal of Medicine published an article stating, "When the amortized cost of the robot itself was included, the additional total cost of using a robot-assisted procedure rose to about $3,200, or about 13% of the cost of these procedures in 2007[.]"  That article also stated, "To date, there have been no large-scale randomized trials of robot-assisted surgery, and the limited observational evidence fails to show that the long-term outcomes of robot-assisted surgery are superior to those of conventional procedures."

78.     On May 17, 2011, the Journal of Healthcare Quality electronically published a study by Johns Hopkins University School of Medicine.  The study concluded that marketing materials provided to ISI to hospitals regarding the robot "overestimate benefits" and "largely ignore risks" of robotic surgery.

### *ISI's Awareness of its Instrument Insulation Problems and Need for Active Electrode Monitoring*

79.     The literature also showed that the insulation ISI had chosen to use on its electrosurgical instruments was insufficient to reliably prevent electricity from leaking into the body and causing internal burns to patients.

80.     In February 2004, the Association of Perioperative Registered Nurses published Recommended Practices that included a recommendation that electrosurgical equipment should include technology to detect stray current that could result in patient injury and to alert the user of this condition.  AORN also found that use of active electrode monitoring minimized the risk of insulation failure and capacitive coupling issues.

81.     In April 2007, the Journal of Minimally Invasive Gynecology published a study that concluded, "Visual inspection is not an appropriate screening mechanism for insulation failure but routine biomedical testing reduces the prevalence of defective laparoscopic instruments."

82.     The 2007 version of ISI's da Vinci S Surgical System User's Manual (ISI product number 550516-04 Rev B) recommended visual inspection of instruments for "irregularities, (i.e. broken, cracked, chipped, or worn parts) prior to system use," but did not recommend or require routine biomedical testing of reusable instruments.  ISI did not subsequently change its recommendations or warnings regarding visual inspection in light of the April 2007 study from the Journal of Minimally Invasive Gynecology.

83.     In April 2009, ISI signed a non-exclusive manufacturing, supply and licensing agreement with Encision Inc., a medical device company that made laparoscopic instruments that featured active electrode monitoring technology.  Despite this agreement, ISI did not incorporate active electrode monitoring into the version of the robot that was used on plaintiff.

84.     In August 2009, a California judge ruled that the failure of a laparoscopic instrument manufacturer could proceed to jury trial on a claim that the instrument in question was defective for filing to include active electrode monitoring in its design.  A California jury later returned a verdict that the product was defective for failure to include active electrode monitoring, and the verdict was affirmed on appeal to the Fourth District, Division 1, Court of Appeal of California.  ISI knew or should have known of this development, but did not subsequently incorporate active electrode monitoring into the version of the robot that was used on plaintiff.

85.     On September 16, 2010, the journal Urology electronically published a study concerning "failure in the accessory tip covers that insulate the monopolar robotic cautery scissor instruments and the patient injuries that have resulted."  The study defined "failure" as "the arcing of the electrical current from the insulated portion of the monopolar scissors or by an intraoperative injury."  The study stated that these observed tip cover failures occurred in 2.6 percent of procedures, with 12 separate failures having been discovered.  The study stated, "All centers and surgeons performing robotic surgery should be aware of the potential for this problem to occur, and the possible interventions that may reduce tip cover failure."

86.     In August 2011, the American Journal of Obstetrics and Gynecology published a study in which insulation on 78 ISI instruments was tested.  Insulation failures were detected in 80 percent of the robotic instruments tested after 10 uses.  The study stated that 32 percent of the instruments suffered insulation failure *before* 10 procedures.  (ISI tells hospitals that these instruments will be safe for the first 10 procedures).  The study found that the "most common location" of insulation failure in robotic instruments was "in the distal shaft," and that this "would result in most of the insulation failures occurring within the abdominopelvic cavity during surgery, but not necessarily in the visual field of the surgeon.  Consequently, stray current may cause thermal damage that may not be detected intraoperatively."  The study also tested non-robotic instruments and concluded, "Robotic instruments have a significantly higher incidence and prevalence of insulation failures compared with laparoscopic instruments."

87.     On January 29, 2011, Yonsei Medical Journal published a case study in which the surgeons discovered unexplained bleeding in their robotic surgery patient. After the surgery, they found two small holes on the tip cover that explained the injury. the patient had been inadvertently burned through escaping energy.  The surgeons wrote, "two unnecessary vascular injuries would have been avoided if the tip cover was intact. Consequences could have been even more sever if bowel or large arteries were injured." The surgeons also stated that active electrode monitoring technology could be "adapted for robotic accessories, components and instrumentation to prevent unwanted tissue burns."

88.     In August 2011, the American Journal of Obstetrics and Gynecology published a study in which 78 robotic instruments were tested for insulation failure.  80% of the robotic instruments tested showed insulation failure within 10 uses (the number of uses for which the instruments are rated).  And the robotic instruments had a "significantly higher incidence and prevalence" of insulation failure as compared to the non-robotic laparoscopic instruments.  The article made explicit that most of the failures occurred on the parts of the instruments that would be "within the abdominopelvic cavity during surgery, but not necessarily within the visual field of the surgeon.  Consequently, stray current may cause thermal damage that may not be detected intraoperatively."

89.     In September 2011, the Journal of Endourology published a study called "Stray Electrical Currents in Laparoscopic Instruments used in da Vinci robot-Assisted Surgery: An *In Vitro* Study."  The study tested 37 ISI instruments for insulation failure. the study found that "Each spark" from arcing caused by insulation failure "reaches temperatures of 700C to 1000C and that, under sparking conditions, "thermal injury to tissue is instantaneous, inevitable, and severe."  The study stated that 24 cases of electrosurgical injury during surgeries using ISI's robot had been reported as of April 18, 2011.  The study also stated that electrosurgical injuries like those reported "are likely to be both under-recognized and under-reported."  The study also stated, "surgeons must be aware that electrosurgical injury can occur with robotic instruments and vigilance for intraoperative and postoperative complications is paramount."  The study also stated, "the extrapolation of our data in the context of active use instruments advocates for the adoption of other safety features, such as the use of alternate energy sources…or

application of active electrode monitoring system, which prevents capacitive coupling and dynamically monitors current flowing through the circuit; it automatically deactivates the [electrosurgical unit] when an insulation failure occurs or excessive capacitive coupling occurs." The study concluded, "static testing of each instrument should be performed before patient use, and the use of alternate energy sources or active electrode monitoring devices is recommended to prevent patient injury in the event of insulation failure."

90.     ISI did not subsequently change its recommendations or warnings regarding the need for static testing, as opposed to only visual inspection, in light of the September 2011 study published by the Journal of Endourology.

91.     Between January 2010 and December 2011, ISI received 134 complaints related to problems with its tip cover accessory, including complaints for arcing through damaged tip covers that caused patient injury. Under 21 CFR § 803.50(b), ISI owed a duty and was responsible at all times for "conducting an investigation of each event and evaluating the cause of the event." If ISI had fulfilled this duty, it would have discovered that the cause of many of these events was the inadequate insulation in its tip covers and shafts of its electrosurgical instruments, as well as its failure to incorporate active electrode monitoring into the design of its robotic surgical system.

92.     On October 17, 2011, ISI sent a letter to certain of its clients with suggestions regarding the use of its tip covers. ISI chose not to recall its tip covers at that time and ISI did not notify the United States Food and Drug Administration of the deficiency in its tip Cover Accessory.

93.     The October 17, 2011 letter from ISI to certain of its clients suggested, but did not mandate, that "operating room staff change the Tip Cover after any portion of a procedure when more than normal cautery has been used and there is additional surgery to be performed."

94.     The October 17, 2011 letter did not explain what "more than normal cautery" meant and was inadequate as a warning about the dangers raised by the insufficient insulation of the tip covers.  The letter understated the true danger from the tip cover accessory problem, and failed to discuss at all the defect in the insulation of the shaft of the da Vinci instruments.

95.     On information and belief, no one on the plaintiff's surgical team received the October 17, 2011 letter concerning ISI's tip cover accessory problem before the plaintiff's surgery.  Plaintiff is unaware of whether the letter was received by appropriate personnel at the hospital.

96.     In March 2012, the Journal of Society of Laparoendoscopic Surgeons published a set of "Principles and Safety Measures of Electrosurgery in Laparoscopy." The article stated that the "risk of accidental burns can be reduced" with "use of an active electrode monitoring system."

97.     In May 2012, ISI replaced the tip cover that had been causing problems with a second generation tip cover.  ISI did not issue an official recall at that time.

98.     Instead, ISI wrote a letter on July 16, 2012 to its hospital customers (but not its doctors), advising them of the new product, but saying, "This is not a product recall."

The letter also stated that the defective version of the tip cover accessory, "has been shown to be both safe and effective when used in accordance with product labeling."

99.     In the July 2012 letter, ISI told the hospitals, "The FDA and other regulatory agencies have been notified of this product replacement program."  In reality, ISI did not notify the FDA until two months after the July 16, 2012 letter.

100.     On December 14, 2012, Surgical Endoscopy published an article called "Instrument Failures for da Vinci Surgical System: a Food and Drug Administration MAUDE Database Study."  This article was based on analysis completed on May 16, 2012 of publically available data concerning procedures that took place between January 2009 and December 2010.  The article reviews information contained in the FDA's adverse event report database, finding 156 separate "arcing" incidents in ISI instruments. "Arcing" incidents were defined as "observed arcing, thermal tissue damage, or postoperative evidence of arcing."  Of these 156 incident, 125 involved arcing by ISI's monopolar curved scissors.  The study states that this database "inherently underrepresents the true denominator of instrument errors[.]"  The study states, "In reality, many instrument failures may go unreported, thus a true failure rate cannot be determined from these data."  One of the authors of this article later went to work for ISI.

101.     ISI was or should have been aware of the articles and studies mentioned in Paragraph 32 through this paragraph, but did not share them with the hospital or the plaintiffs' surgical team.  As a proximate result of the failure to share that information and make design and warning changes based off of that information, plaintiff was injured.

## *FDA Investigation*

102.   On April 1, 2013 and May 30, 2013, the United States Food and Drug Administration inspected ISI's facilities in Sunnyvale, California.  These inspections revealed that the Tip Cover Accessory was an "adulterated device" because "the methods used in, or the facilities or controls used for its manufacture, packing, storage, or installation" were not in conformity with "the Current Good Manufacturing Practices (CGMP) requirements for devices" mandated by the FDA.

103.   ISI did not warn consumers about the inadequacy of its insulation until May 8, 2013.  On that day, ISI sent an electronic communication to its customers stating that it "has identified a potential issue with certain versions of its **Hot Shears Monopolar Curved Scissors** ("MCS") Instrument" and that "Certain versions" of those instruments "may develop micro-cracks near the distal (scissor) end of the shaft following reprocessing."  ISI admitted in that communication, "This may create a pathway for electrosurgical energy to leak to tissue during use and potentially cause thermal injury."  ISI also admitted in that communication, "**These micro-cracks may <u>not</u> be visible to the user**."

104.   On May 31, 2013, ISI issued a Class 2 Recall for its 8mm Monopolar Curved Scissors.  The FDA assigned Recall Number Z-1442-2013 to the Recall and Recall Event ID 65216.  This recall applied to approximately 132,441 instruments in commerce.

105.   The recall was ineffective to prevent injury to the plaintiff.

## *Count I – Strict Product Liability - Defect in Construction*

106.   ISI manufactured and sold the da Vinci robotic system, including electrosurgical instruments.

107.   The da Vinci robotic system and/or its electrosurgical instruments contained a manufacturing defect when it/they left ISI's possession.  Alternatively, the da Vinci robotic system and/or its electrosurgical instruments deviated in construction or quality from the specifications or planned output of ISI in a manner that rendered them unreasonably dangerous.

108.   Plaintiff was harmed by the da Vinci robotic system and the electrosurgical instruments.

109.   The manufacturing defect, described above, was a substantial factor in causing plaintiff's harm.  Alternatively the defect was a producing cause of the injury to plaintiff.

## *Count II – Strict Product Liability - Defect in Design*

110.   ISI manufactured and sold the da Vinci robotic system, including electrosurgical instruments.

111.   The da Vinci robotic system and/or its electrosurgical instruments did not perform as safety as an ordinary consumer would have expected them to perform when used or misused in an intended or reasonably foreseeable way.  Alternatively, there was a safe alternative design.

112.    Plaintiff was harmed by the da Vinci robotic system and/or the electrosurgical instruments.

113.    The failure to perform safely, as described above, was a substantial factor in causing plaintiff's harm.  Alternatively, the defect was a producing cause of the injury to plaintiff.

## Count III – Strict Product Liability Defect in Warnings/Marketing Defect

114.    ISI manufactured and sold the da Vinci robotic system, including electrosurgical instruments.

115.    The da Vinci robotic system and/or its electrosurgical instruments had potential risks that were known or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community at the time of sale of the system/instruments.  Alternatively, there was a risk of harm inherent in the product or that may have arisen from the intended or reasonably anticipated use of the product, and ISI actually knew or reasonably foresaw the risk of harm at the time the product was marketed.

116.    The potential risks presented a substantial danger when the system/instruments were used or misused in an intended or reasonably foreseeable way.

117.    Ordinary consumers would not have recognized the potential risks.

118.    ISI failed to adequately warn or instruct of the potential risks. Alternatively, the produce possessed a marketing defect, and the absence of the warning

or instructions rendered the product unreasonably dangerous to the ultimate user or consumer of the product.

119.    Plaintiff was harmed by the da Vinci robotic system and/or the electrosurgical instruments.

120.    The lack of sufficient instructions or warnings, described above, was a substantial factor in causing plaintiff's harm.  Alternatively, the failure to warn or instruct constituted a causative nexus in plaintiff's injury.

## Count IV – Negligence and Negligence Per Se

121.    ISI designed and manufactured the da Vinci robotic system, including electrosurgical instruments.

122.    ISI was negligent in designing, marketing, and manufacturing the da Vinci robotic system, including electrosurgical instruments.

123.    ISI was negligent because it failed to recall and/or retrofit the da Vinci robotic system, including electrosurgical instruments.  ISI knew, or reasonably should have known, the da Vinci robotic system, including electrosurgical instruments, was dangerous or likely to be dangerous when used in a reasonably foreseeable manner.  ISI became aware of this defect after the da Vinci system and/or the instruments were sold. ISI failed to recall, retrofit, and/or warn of the danger of its product.  A reasonable manufacturer, under the same or similar circumstances, would have recalled and/or retrofitted the product.

124. ISI was negligent per se as a result of its violations of the Federal Food, Drug and Cosmetic Act (FDCA) US Code Title 21 Chapter 9, which caused and/or contributed to Plaintiff's injuries which the "FDCA" was intended to prevent.

125. Plaintiff was harmed as a result of ISI's negligence.

126. ISI's negligence was a substantial factor in causing plaintiff's harm.

## Count V- Strict Liability

127. Plaintiffs incorporate by reference all the allegations contained in the foregoing paragraphs as if they were fully restated herein.

128. The Defendant transferred the da Vinci Surgical System, including its accessories, components and instrumentation, in the course of its business to medical hospitals and facilities throughout the United States.

129. The da Vinci Surgical System, including its accessories, components and instrumentation, was used in a manner reasonably anticipated.

130. The da Vinci Surgical System, including its accessories, components and instrumentation, had the following defective conditions which rendered it unreasonably dangerous when put to its reasonably anticipated use:

(a) Defective in its design;

(b) Defective in its manufacture;

(c)  Defective in its inspection and testing;

(d) Defective in its warnings;

(e) Defective in its nonconformance with Intuitive's representations; and

(f) All other defects that become known between now and the trial of this

matter.

131. The Plaintiffs were damaged as a direct result of such aforementioned

defective conditions, which existed when the da Vinci Surgical System, including its

accessories, components and instrumentation, was sold.

132. The da Vinci Surgical System, including its accessories, components and

instrumentation, was unreasonably dangerous when put to a reasonably anticipated use

without knowledge of its characteristics, and the Plaintiffs were damaged as a direct

result of the product being sold without an adequate warning.

WHEREFORE, the Plaintiffs demand judgment against the Defendant in an

amount to fully and fairly compensate Plaintiffs for their injuries and damages, punitive

damages, for the costs of this action, for interest as allowed by law, and for all other just

and proper relief.

## Count VI- Negligent Misrepresentation and/or Intentional Misrepresentative or Fraud

133. Plaintiffs incorporate by reference all the allegations contained in the

foregoing paragraphs as if they were fully restated herein.

134. Intuitive is the manufacturer, designer, distributor, seller and/or supplier of

the da Vinci Surgical System, including its accessories, components and instrumentation,

and, while engaged in the course of such  business,  made representations to Plaintiffs

and/or their physicians and other health care providers regarding the character and/or

quality of the da Vinci Surgical System, including its accessories, components and

instrumentation, for guidance in their decision to select the da Vinci Surgical System, including its accessories, components and instrumentation, for its use during their surgical procedures.

135. Specifically, Intuitive represented that the da Vinci Surgical System, including its accessories, components and instrumentation, was just as safe, and just as effective or more effective, than other surgical platforms and/or surgical procedures performed without its use.

136. Intuitive's representations regarding the character or quality of the da Vinci Surgical System, including its accessories, components and instrumentation, were untrue.

137. Intuitive had actual knowledge, or should have known such knowledge, based upon studies, published reports, and clinical experience, that its da Vinci Surgical System, including its accessories, components and instrumentation, created an unreasonable increased risk of serious bodily injury and death to consumers.

138. Intuitive negligently and/or intentionally misrepresented or omitted this information in its product labeling, promotions and advertisements and, instead labeled, promoted, and advertised its product as safe and effective in order to avoid losses and sustain profits in its sales to consumers and health care providers and its action were willful, wanton and malicious.

139. As a direct and proximate result of Intuitive's negligent and/or intentional misrepresentations, Plaintiffs suffered personal injury, economic and non- economic damages, and death.

140. Intuitive's conduct as alleged herein demonstrates that Intuitive acted willfully, wantonly, and maliciously, suggesting an improper motive so as to warrant the imposition of punitive damages.

WHEREFORE, the Plaintiffs demand judgment against the Defendants in an amount sufficient to fully and fairly compensate Plaintiffs for their injuries and damages, punitive damages, for costs of this action, for interest as allowed by law, and for all other just and proper relief.

## *Count VII - ISI's Fraud*

141.   ISI made representations of fact, including the representation that: (1) its device was safe for use in surgery; (2) surgeries performed with its device provide better outcomes for patients than comparable surgeries performed without the device; (3) surgeons trained and certified by ISI were adequately informed about the dangers inherent in da Vinci surgery and the ways to minimize those dangers; (4) surgeries performed with its device were the most effective treatment option available; (5) the da Vinci system required that every surgical maneuver be performed with direct input from the surgeon, even though the robot's design and construction allowed cauterizing energy to be released from the robot outside the surgeon's view or control; and (6) the first general tip cover, as of July 16, 2012, "has been shown to be both safe and effective when used in accordance with product labeling."

142.   The factual representations by ISI were material, in that any one of these representations, standing alone and/or combined, would have given the hospital, the

plaintiff's surgical team and the plaintiff reason to investigate alternatives to da Vinci surgery.

143.    The representations by ISI were false.  Alternatively, they were untrue.

144.    The hospital and the plaintiff's surgical team, who acted as learned intermediaries between ISI and plaintiff, did not know ISI's representations were false. Likewise, plaintiff did not know that ISI's representations were false.

145.    ISI intended that the hospital and the plaintiff's surgical team would act upon its representations as learned intermediaries for plaintiff.  ISI also intended that plaintiff would act upon its representations, as relayed to him by his learned intermediaries.

146.    The hospital and the plaintiff's surgical team had a right to rely on the truth of ISI's representations.  Plaintiff also had a right to rely on the truth of ISI's representations.

147.    The hospital and the plaintiff's surgical team did rely on the truth of ISI's representations.  Plaintiff also did rely on the truth of ISI's representations, which were relayed to him by his learned intermediaries.

148.    Plaintiff was damaged by the reliance of the hospital and the plaintiff's surgical team on ISI's representations.  Plaintiff was also damaged by her own reliance on ISI's representations, which were relayed to them by their learned intermediaries.

149.    Alternatively, ISI's misrepresentations were actually omissions and/or were simply negligent misrepresentations and/or omissions, and ISI is liable for concealment and/or negligent misrepresentation.

150.    Alternatively ISI is liable under Business and Professions Code §§ 17200, et seq.

## *Count VII- Loss of Consortium*

151.    Plaintiffs incorporate by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated herein.

152.    As a result of the acts and/or omissions of Intuitive, as set for herein, the spouse, Tom Rogers, suffered injury and impairment to his marital relationship with his wife.

153.    As a direct result of the tortious injury to his spouse by Defendant's defective and dangerous da Vinci Surgical Systems, its accessories, components and instrumentation, plaintiff has sustained an impairment to his marriage he once enjoyed including the conjugal society, companionship, sexual relations, comfort, affection, emotional support, love, felicity, assistance, protection and moral support.  That the losses he has sustained were immediate and consequential, not remote nor unforeseeable.

154.    By reason of the foregoing, Intuitive is liable to Plaintiff's spouse in an amount to be proven at trial.

## *Damages*

155.    The thermal/electrosurgical injuries suffered by plaintiff and their aftermath caused plaintiff physical pain, mental anguish, emotional distress, disfigurement, and physical impairment.

156.    These injuries suffered by plaintiff and their aftermath have required extensive medical/surgical treatments.

157.    These injuries and their aftermath have caused injuries to other parts of plaintiff's body.

158.    Plaintiff had to undergo numerous further surgical and/or other medical procedures because of the thermal/electrosurgical injuries and their aftermath.

159.    The consequences of these injuries and their aftermath have made it more difficult for plaintiff to enjoy her life since the surgery.

160.    The consequences of these injuries and their aftermath will continue to make it more difficult for plaintiff to enjoy the rest of her life.

161.    Because of these injuries and their aftermath, plaintiff incurred enormous medical expenses and lost business and economic opportunities.

162.    Because of the injuries, plaintiff will incur future medical expenses and lost business and economic opportunities.

## *Punitive Damages*

163.    California has an interest in deterring activities that illustrate a "conscious disregard of safety" of others, originating from corporations that have a "substantial business presence within its borders".

164.    ISI's actions, described above, illustrate a conscious disregard of safety of others.

165.    ISI has a substantial business presence in California.

166.    ISI makes da Vinci robots in California.

167.    ISI directs its operations out of California.

168.    ISI's decision to use faulty insulation and other faulty components, accessories and instrumentation and the decision to not report information about the defective product were all made in California as required by the "FDCA".

169.    ISI's failure to identify the dangers inherent in its product occurred in California.

170.    ISI promotional materials and advertisements all originate in California.

171.    ISI is liable for punitive damages to plaintiff under California Civil Code Sections 3294-3296 - Exemplary Damages.

## Limited Waiver of Physician/Patient Privilege

172.    Plaintiff waives the physician/patient privilege only insofar as necessary to place any and all alleged damages at issue at the time of trial, as might be required by applicable statute or case law.  It should be understood that her actions do not constitute a waiver of any of her constitutional rights and that the ISI is not to contact any treating physicians without first notifying counsel for plaintiff so that they might bring the matter to the attention of the Court and seek appropriate relief, including imposing limitations and restrictions upon any desire or intent by the defendants to contact past or subsequent treating physicians *ex parte*.

## *Prayer for Relief*

WHEREFORE, plaintiffs pray for judgment against ISI by way of compensatory and punitive damages in such amounts as might be proven at the time of trial and decided and determined by the trier of fact as reasonable and just under the evidence, as well as for attorney fees, costs, and disbursements herein incurred, and for such other relief as the Court may deem just and equitable, including relief under Business and Professions Code §§ 17200, et seq.

### *Demand for Jury*

Plaintiffs demand trial by jury.

DATED:  April 12, 2018

> s/Cameron Husty
> Cameron Husty (CA Bar 97062)
> camhusty@gmail.com
> Attorney at Law
> 1710 Hermitage Drive
> Round Rock, Texas 78681
> Phone: 876 435-7934
>
> Ronnie G. Penton (LA Bar 10462)
> fedcourtmail@thepentonlawfirm.com
> The Penton Law Firm
> 503 Georgia Avenue
> Bogalusa, Louisiana 70427
> Phone:   985-732-5651
> Fax:      985-735-5579
>
> *Attorneys for Plaintiff*
> Appearing Herein *pro hac vice, pending*